In the Matter of the WEST GREAT FALLS FLOOD CONTROL AND DRAINAGE DISTRICT.

No. 11946.
Submitted June 14, 1971.
Decided Dec. 7, 1971.
On Rehearing May 11, 1972.
496 P.2d 1143.

Graybill, Graybill, Ostrem & Warner, James, Crotty & Fopp, Gene Fopp argued, Jardine, Stephenson, Blewett & Weaver, Alex Blewett, Jr. and John Blackwood argued, Great Falls, for appellants.

Swanberg, Koby & Swanberg, Randall Swanberg argued, Great Falls, for respondents.

The HON. L. C. GULBRANDSON, District Judge, sitting in place of MR. JUSTICE DALY, delivered the Opinion of the Court.

This is an appeal from an order and decree of the Cascade County district court confirming with modifications proposed assessments against property within the West Great Falls Flood Control and Drainage District to cover initial construction costs of a flood control project.

Appellants are approximately sixty in number, all of whom are property owners within the district; they can be classified in three groups: (1) individual property owners, principally those whose property is situated in the County Club Addition; (2) the Montana Power Company; (3) the Montana Highway Department. Respondents are the district and its commissioners.

The West Great Falls Flood Control and Drainage District, herein called the District, was created by order of the district court on March 22, 1967 following a petition therefor, signed by approximately sixty-three percent of the landowners. The district contains about 2950 acres with about 1900 land-

owners. The purpose of the district was the construction and maintenance of levees, dikes and other flood control facilities.

The flood control project was designed by the United States Army Corps of Engineers to protect property from the effects of a recurrence of a flood or floods of the severity of the 1953 flood, the 1964 flood, which caused approximately six million dollars damages, and a "design" (hypothetical) flood of greater severity than either the 1953 or 1964 floods. According to the Corps of Engineers, it is estimated that the possibility of recurrence of a flood equal to the flow discharge of the 1964 flood is approximately once every 160 years, and the possibility of a "design" flood is approximately once every 250 years. Estimated cost of the project is six million dollars.

On or about December 23, 1968, the District, by and through its acting commissioners, mailed notices to the various property owners, including appellants, setting forth the amount of alleged "Benefits Assessed" and proposed "Assessment for Costs" in connection with the initial construction of the project.

On December 30, 1968, the District commissioners filed their Third and Final Report with the court, which report, among other things, requested the court to approve and confirm said assessments.

In due course appellants objected to the confirmation of their respective assessments, among other things contending that the methods used in determining and fixing assessments by the commissioners were arbitrary, capricious, discriminatory, illegal, invalid, and void, and that the costs being assessed by the District were oppressive and far exceeded the value of any benefits which might reasonably accrue from the construction of the project.

After hearings were held, the order and decree, from which this appeal was taken, was entered on August 17, 1970.

Thereafter, appellants timely served exceptions to the find-

ings of the court and their motion for an order to amend the findings.

The district court took no action within fifteen days and the exceptions were deemed denied.

A "Stipulation of Facts" was entered into by counsel for appellants and respondents, and paragraph (10) of said Stipulation of Facts provides, in pertinent part, as follows:

"(10) That the manner and method of working out assessments is covered for the most part by the Commissioners' reports; that wherever improvements are located on any of the land within the District their valuation was, and will be, included, for assessment purposes, both for the initial costs in connection with the construction of the project and for maintenance assessments thereafter. That, in general, all property within the District, for purposes of assessment, was divided by the Commissioners into three zones, with different rates of assessment, based on the assessed value of land and improvements as shown on the Cascade County assessment rolls. The basis asserted by the Commissioners for the three zones referred to is as set forth in the reports of the Commissioners and testimony and evidence, to-wit: the purpose of the zones was to relate the assessed values obtained on various properties to danger from flood. The District was divided into three zones: Zone A including all lands and improvements which were flooded by high water in 1953 and/or 1964; Zone B including lands and improvements not flooded in 1953 or 1964, but which would be subject to the "design" flood; and Zone C including lands and improvements which would not be flooded under the "design" flood but which, the Commissioners concluded, would be benefited by virtue of increased property values in the immediate neighborhood, prevention of flooding of access roads, sewers, gaslines, waterlines, health hazards, etc. It was determined by the Commissioners that the benefits to improved lands in Zone A, should be valued at 100% of assessed value; benefits to improved

lands in Zone B, valued at 60% of its assessed value; and benefits to improved lands in Zone C, valued at 35% of assessed value, and that improvements on the land were to carry the same classification as the land itself (i.e., if the level of the land placed it in a certain zone the improvements thereon were considered as being in the same zone even if, in fact, part or all of the improvements would be above the water level of the zone into which the land was placed). That the Commissioners, in arriving at the amount of assessments for Appellants (or others within the District whose property did appear on the assessment rolls of Cascade County) did not make, nor have made for them, any appraisal(s) relating to the value of alleged benefits to be received by Appellants by reason of the creation of the District or the construction of the project; that the Commissioners, in arriving at said assessments, did not assign any dollar and cents value(s) to any particular alleged benefit(s) to be received by Appellants; and that the assessments for the initial costs of the project were arrived at (and the assessments for maintenance cost will be arrived at) by programming into the computer the total assessed value of all real property and improvements within the District considered by the Commissioners and obtained from the Cascade County Reclassification Office as adjusted by the percentage of such value for the Zone or Zones in which the property was situated in each case (i.e., if the property was in Zone A, 100% of assessed value was used; if in Zone B, 60%; if in Zone C, 35%), including the zone-adjusted assessed values of land and improvements of Appellants, and, in the case of the initial costs of the project, the $2,000,000.00 estimated local initial costs (and in the case of maintenance the estimated annual maintenance costs) to arrive at what the percentage of the estimated initial local costs (or annual maintenance costs) was (will be) of the total zone-adjusted assessed values of property considered by the Commissioners. This percentage (which approximated 25% in the case of the initial

project costs) was then applied (will hereafter be applied in the case of maintenance costs) to the zone-adjusted assessed values of Appellants' properties to arrive at the amount of Appellants' assessments."

The issues for review upon appeal relate generally to the assessment and assessment procedures used against the property of the three classes of appellants. We deem it unnecessary to go into all the details of the objections raised other than to say that each group of appellants claims that the assessments and assessment method is arbitrary and capricious and therefore illegal as to their property.

The Commissioners, in arriving at the amount of individual initial assessments, used the full assessed value of the property owner's land and improvements (or 60% and/or 35% in those lands in Zones B and/or C) in determining the "Amount of Benefits Assessed" appearing in the various assessment notices given by the District. It is clear that the Commissioners assessed benefits against improvements as well as land, although the Commissioners have argued that they merely used the value of improvements as well as the value of land as a "yardstick" of benefits.

The statutory authority for the assessments of the properties, mostly residential, with which we are here concerned, must be found under section 89-2330, R.C.M.1947, which provides in pertinent part as follows:

"What *lands,* easements, irrigation ditches, cities, towns, counties, individuals and other corporations and persons should be assessed for the payment of any part of the cost of constructing the proposed drains, repairs thereto, maintenance thereof and the incidental expenses attached to the establishment of such drainage district. In apportioning such costs and expenses, the following principles shall be regarded and the following *classes of property,* persons, corporations and municipalities shall be assessed:

"*       *       *       *       *       *       *       *

"All *lands* from which surface or seepage waters will enter or can be conducted into the proposed drainage system;

"All *lands* upon which or through which, surface or seepage waters will be prevented from flowing, or can be prevented from flowing, by virtue of the construction of the proposed drainage system;

"All *lands* which will sustain any *direct benefit* of any kind or character whatsoever;

"*      *      *      *      *      *      *      *

"The assessment against each tract, lot, easement, town, city, county, irrigation ditch, railroad, individual or corporation owner thereof *which will be benefited by the proposed work* * * * and the proportionate share of cost of construction of the proposed drainage system which each of them should bear shall be shown in tabular form, the columns of which shall be headed as follows: Column 1—Owners of property assessed; 2—Description of property assessed; 3—Number of acres assessed; 4—Amount of benefits assessed; * * * 8—Assessment for costs; * * *." (Emphasis supplied.)

From the emphasized language in the foregoing statute (and, for that matter, from the wording in the entire drainage district statute under which this District was formed) it can be seen that the legislature very carefully limited assessments to *"lands"* which would be benefited by the project.

Section 89-2201, R.C.M.1947, relating to the petition for creation of a district, provides in part:

"Whenever a majority of the adult owners of lands within any district of land, who shall represent *one-third in area of the land* within said district to be reclaimed or benefited, or whenever the adult owners of *more than one-half of the lands* within such district desire to construct one or more drains * * * or other works across the lands of others * * * for the * * * drainage of said lands and removal of surface waters therefrom * * * such owners may file * * * a petition * * *." (Emphasis supplied.)

Section 89-2202, R.C.M.1947, relating to the dissolution of drainage districts, provides in pertinent part:

"Whenever the adult owners of more than one-half of the *lands* within any drainage district, * * * shall present to the district court * * * a petition * * * praying that such drainage district be dissolved * * * and if it appears that the adult owners of more than one-half of the *lands* in said drainage district have signed said petition, it shall be granted, and thereupon, the court shall make an order directing the said commissioners to file a written report * * * setting forth the amount of the debts and obligations of said drainage district. Within thirty days after such report is filed, the court shall cause to be spread, or spread, a levy against all *lands* in said district on the basis of the final report of the commissioners, as confirmed by the court, and if no final report has been made, then on an *area basis* * * *."

Section 89-2213, R.C.M.1947, refers to *"one-third in area of the lands"*. (Emphasis supplied.)

In section 89-2305, R.C.M.1947, relating to the qualifications of electors for commissioners, the statute provides in pertinent part:

"At all such elections * * * the following persons holding title, or evidence of title to *lands* within the district shall be entitled to vote: * * * *In all elections each elector shall be permitted to cast one vote for each forty acres of land, or major fraction thereof in the district owned by such elector, but any elector owning twenty acres or less shall be entitled to one vote.*" (Emphasis supplied.)

Section 89-2345, R.C.M.1947, relating to a judgment on a dismissal of the proceedings, provides for a judgment to be entered against the petitioners and in favor of the commissioners for the costs, expenses, and liabilities incurred, etc. It further provides in such cases that the judgment shall direct the commissioners to assess such costs, expenses, and liabilities incurred in the proceedings up to the time of the dismissal and

discontinuation *"on an acreage basis against the lands in said district."* (Emphasis supplied.)

Section 89-2347, R.C.M.1947, still discussing what happens when a judgment is entered dismissing the proceedings or the district is discontinued, provides that:

"All petitioners shall, among themselves, contribute to the payment of said judgment in proportion to the *number of acres of land* they have within the boundaries of the proposed district at the time of filing the said petition." (Emphasis supplied.)

In section 89-2702, R.C.M.1947, relating to necessary alterations and/or additions to the drainage system of a drainage district, it is provided, in part, that:

"* * * Wherever such commissioners shall fail or refuse to file such petition or, in event any landowners desire to file such petition, such petition may be filed by such landowners, provided the same be signed by the owners of at least forty per centum (40%) *in area* of the lands in said district." (Emphasis supplied.)

In section 89-2704, still relating to proposed alterations or additions to the drainage system, it is provided that any "landowner" or corporation may file objections and that:

"* * * If objections are made and filed by the owners of at least seventy-five per centum (75%), *in area* of the lands in said district, said petition shall be dismissed * * *. If the owners of less than seventy-five per centum (75%) *in area* of the lands in said district object to such petition, then * * * the court * * * will hear testimony * * * and * * * determine whether the proposed alteration and/or addition is necessary, whether it will be beneficial to said district * * *." (Emphasis supplied.)

Sections 89-2821 through 89-2825, R.C.M.1947, are the amendments to the drainage district act enacted by the Legislature in 1957. In section 89-2822, R.C.M.1947, the additional powers are enumerated which do not, in any way, change the clear intent of the original sections that assessments are to be levied

for benefits to "lands". In pertinent part, section 89-2822, R.C.M.1947, provides:

"To the end that soil and water conservation measures may be improved, flood prevention and drainage programs strengthened, and the land and water economy of the state stabilized, the following additional powers are conferred upon presently existing drainage districts or new districts as created and established under sections 89-2201 through 89-2820, and laws amendatory thereof and supplementary thereto:

"(1) To carry out necessary measures for the prevention of floodwater and sediment damages and for the conservation, development, utilization and disposal of water; and to adopt necessary regulations, policies and procedures to accomplish these ends, subject to the approval of the district court and on proper notice to interested parties as is provided for in the general statutes pertaining to drainage districts.

"*     *     *     *     *     *     *     *

"(6) To make assessments  *  *  *  for carrying out the purposes of this act and for construction, maintaining and operating any structures or improvements established as provided herein, *such assessments  *  *  *  to be made in the same manner and through the same procedures as under the statutes presently pertaining to drainage districts  *  *  **". (Emphasis supplied.)

It can, therefore, be seen that nowhere in the statutes under which the present district was created, either specifically viewing all of the statutes as a whole, or considering the special 1957 amendatory statutes designed to allow the old drainage district act to be used for flood control purposes, is there any authorization for the commissioners' acts in levying assessments upon the value of improvements.

In order to uphold the validity of the assessments levied against improvements by the commissioners, the Court would have to construe the terms "land" and "lands" in the assessment statutes to mean "land and improvements."

Section 67-208, R.C.M.1947, enacted in 1895, states:

"Land is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance."

Section 67-206, R.C.M.1947, states:

"Property is either:

"1. Real or immovable; or,

"2. Personal or movable."

Section 67-207, R.C.M.1947, states:

"Real or immovable property consists of:

"1. Land;

"2. That which is affixed to land;

"3. That which is incidental or appurtenant to land;

"4. That which is immovable by law."

Section 67-209, R.C.M.1947, states:

"A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent as by means of cement, plaster, nails, bolts, or screws."

Section 12-215, R.C.M.1947 (first enacted in 1895 and a part of our Codes at the time the Legislature enacted the drainage district statutes) provides:

"Whenever the meaning of a word or phrase is defined in any part of this code, such definition is applicable to the same word or phrase wherever it occurs, except where a contrary intention plainly appears."

■ Courts must take, interpret, and operate under the statutes as they find them.

"* * * In construing a statute, the intention of the Legislature is controlling. * * * The intention of the Legislature must first be determined from the plain meaning of the words used, and if interpretation of the statute can be so determined, the courts may not go further and apply any

other means of interpretation. \* \* \* Where the language of a statute is plain, unambiguous, direct and certain, the statute speaks for itself and there is nothing left for the court to construe. \* \* \* *The function of the court is simply to ascertain and declare what in terms or in substance is contained in the statute and not to insert what has been omitted.* \* \* \* *In short, it is simply the duty of the Supreme Court to construe the law as it finds it.* \* \* \*" (Emphasis added.) Dunphy v. Anaconda Co., 151 Mont. 76, 79-80, 438 P.2d 660, 662 (1968); Section 93-401-15, R.C.M.1947.

Nowhere in the drainage district statutes did the Legislature use terms which might indicate ambiguity (i.e., the terms "real estate," "real property," "improvements," "fixtures," etc., are *not* used.)

The respondents and the trial judge in approving assessments upon improvements, apparently relied upon the case of Clark v. Clark, 126 Mont. 9, 242 P.2d 992, decided by this Court in 1952. There this Court was concerned with the dower statute (Section 22-101, R.C.M.1947) and the decision was that, where a husband possessed an unpatented mining claim at the time of his death, and there was no relinquishment or abandonment, his widow upon his death became endowed with a one-third interest in the claim. Section 22-101, R.C.M.1947, contains within its provisions not only the words "land" and "lands" but also "equitable estates" and "all real estate of every description."

The *Clark* decision contained the following paragraph, which was not necessary to the decision, and which we now correct:

"The terms 'lands' and 'real estate', as used in the statutes of Montana, are synonymous. Black v. Elkhorn Mining Co., C.C., 49 F. 549, affirmed 9 Cir., 52 F. 859, affirmed, 1896, 163 U.S. 445, 16 S.Ct. 1101, 41 L.Ed. 221. This usage of the terms 'land' or 'lands' is almost the universal rule. Griffin v. Clark, 55 Idaho 364, 42 P.2d 297; Krouser v. County of San Bernardino, 29 Cal.2d 766, 178 P.2d 441."

The federal courts in the Black v. Elkhorn Mining Co. decisions, cited for the proposition that: "The terms 'lands' and 'real estate', as used in the statutes of Montana, are synonymous", reached this conclusion on the basis of subparagraph Fifth of section 202 of the Compiled Statutes of Montana which was in effect at the time the case originated, but which section was repealed by the Act approved February 19, 1895 (See section 6235, R.C.M.1907) and was not re-enacted in the Montana Codes Annotated of 1895, when the language of section 67-208, R.C.M.1947, defining land as "* * * The solid material of the earth * * *." was first enacted. The language of said section 202 relied on by the *Black* case is not now, and was not at any time after its repeal, incorporated in any statute of this state.

In the *Black* case, as reported in Vol. 49 of the Federal Reporter, at page 552, it is stated:

"* * * the words 'lands' and 'real estate' are used in the statutes of Montana as synonymous terms. The definition of both is the same. See section 202, Comp. St.Mont. p. 648. * * *"

In the United States Supreme Court decision in the *Black* case, it is stated, at page 446 of 163 U.S., at page 1101 of 16 S.Ct.: "* * * Another statute of Montana provides that 'the word "land" or "lands" and the words "real estate" shall be construed to include lands, tenements and hereditaments, and all rights thereto and all interests therein.'" (Citing section 202.)

It is noted that the case of Griffin v. Clark, 55 Idaho 364, 42 P.2d 297, cited in *Clark* in support of the proposition that: "This usage of the terms 'land' or 'lands' is almost the universal rule * * *." does not discuss the definition of land at all, but that the case preceding the *Griffin* case in 42 P.2d does, at page 297, contain language relating to a discussion of the term "land". Assuming that the "preceding" case of Reynard v. City of Caldwell, 55 Idaho 342, 42 P.2d 292, 297

(1935) was intended to be cited by this Court (and not Griffin v. Clark), the *Reynard* case merely quotes general law from Corpus Juris.

Section 19-103, R.C.M.1947, cited in the *Clark* case, refers to the words "real property", (as does section 67-207, R.C.M.1947) and not to "land".

In Sinclair Refining Co. v. Burroughs, 133 F.2d 536 (C.A.10, 1943), the Tenth Circuit, construing *Oklahoma statutes defining "real property" and "land" identical to those in Montana,* in a declaratory judgment action involving assessments under drainage district statutes, in concluding, among other things, that assessments against right-of-way of certain pipe line companies were unauthorized and void because the statute empowered the levy of assessments only against "lands", stated, at page 539 of 133 F.2d:

"Whether the right of way of the pipe line companies is subject to special benefit assessments presents a serious question. Sec. 331, Title 82 O.S.A., directs that the assessments be placed on *all lands* benefited by the improvement. The terms 'land' and 'real estate' as used in the Oklahoma statutes are not synonymous terms. Section 5 of Title 60 O.S.A., defines 'real property' as consisting of:

" '1.   Land.

" '2.   That which is affixed to land.

" '3.   That which is incidental or appurtenant to land.

" '4.   That which is immovable by law.' "Section 6 of the same Title defines lands as follows:

" 'Land is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance.'

"Having defined the terms 'land' and 'real property,' it must follow that when the law making body of the state uses one or the other of these terms, it uses them in the sense in which it had defined them. The applicable statute having directed that the assessment shall be levied on the land benefited by

the improvement, it follows that the interests of the pipe line companies can be assessed only if they fall within the term 'land' as it has been defined by law.

\* \* \* \* \* \* \* \*

"Had the legislature used either or all of the terms, 'land', 'real property', or 'real estate', and coupled therewith the further term 'or any interest therein', as it might have done, there would be no question but that these rights of way would be assessable. But this it did not do. It used the term 'land' and stopped there, and we may not by interpretation read into the law after the word 'land', 'or any interest therein.'

\* \* \*"

Further insight into the intention of the Legislature can be gained from Chapter 33 of Title 89, R.C.M.1947 (County and Municipal Participation in Flood Control and Water Conservation), enacted by the Legislature in 1965, and amended in 1967 (which enactment came as a direct result of the efforts of Cascade County Legislators and others after the 1964 flood).

Section 89-3309, R.C.M.1947, is entitled "Levy of special assessment—apportionment to property benefited." This statute provides for a levy of an annual special assessment for operation and maintenance "against all real property in the area benefiting from such system." As originally enacted the next sentence specified: "Such special assessment shall be apportioned among the several lots or parcels of real property in the benefited area in proportion to the benefit conferred." In 1967, the last quoted sentence was deleted and the following language added:

"Such special assessment shall be levied against each lot or parcel of land in the benefited area for that portion of the money required which its area bears to the total area of all of the lands to be assessed; or said assessment may, at the option of the governing body of the city, town or county, as the case may be, be based upon the taxable valuation, as stated in the last completed county assessment roll, of the lots

or parcels of land *exclusive of improvements thereon,* within said benefited area, in which case each lot or parcel of land to be assessed shall be assessed with that part of the amount of money required which is taxable valuation bears to the total taxable valuation of all the lands to be assessed. * * *" (Emphasis supplied.)

In Fergus Motor Co. v. Sorenson, 73 Mont. 122, 132, 235 P. 422, 425 (1925), this Court stated:

"It has been stated as a rule of construction: 'If it can be gathered from a subsequent statute *in pari materia* what meaning the Legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.' * * *."

To the same effect is the statement in Great Northern Ry. Co. v. United States, 315 U.S. 262, 277, 62 S.Ct. 529, 535, 86 L.Ed. 836, 844, where the Supreme Court of the United States, in a case arising out of the District of Montana, stated:

"* * * It is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.' * * *"

The Legislature, in enacting legislation for flood control as a result of the 1964 flood, having excluded improvements from special assessments and having used the words "land" and "lands" in the drainage statutes, which words have been defined in section 67-208, R.C.M.1947, intended that special assessments for flood control purposes be limited to land, exclusive of improvements, insofar as assessments under section 89-3309, R.C.M.1947, and section 89-2330, R.C.M.1947, are concerned.

Respondent argues that the case of State Highway Comm. v. West Great Falls Flood Control & Drainage Dist., 155 Mont. 157, 468 P.2d 753, is authority for a broader interpretation of the word "land". This Court said at 468 P.2d 759:

"On the foregoing basis, we hold that the legislature has authorized assessment of the State through its agent, the State

Highway Commission, for flood control benefits to its *land* and *improvements* within the exterior boundaries of the West Great Falls Flood Control and Drainage District." (Emphasis supplied.)

This statement must be understood in the context of the facts of that case. There the improvements consisted of grading of the land, drainage culverts, highway bridges, road beds, pavement and the like. This Court did not intend to go beyond the issues so presented in that case which is no authority for the assessment of improvements.

From what has been said heretofore it is clear that the Montana Power Company cannot be assessed on any of its property on the basis that it was assessed here. If it is assessable at all, it is assessable only under section 89-2333, R.C.M. 1947 for special benefits derived. Here, it owns no "land" within the proposed district and thus its assessment on that basis is invalid. Although the briefs make much of the constitutionality of Section 89-2333, R.C.M.1947, we are not called upon to make such ruling here.

The order and decree of the district court entered August 17, 1970, is vacated and set aside. This cause is remanded to the district court for further proceedings not inconsistent herewith.

We recognize that this decision may make the flood control program virtually impossible without further legislation. However, we must rule on the law as it is and not what some may desire it to be.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN C. HARRISON, HASWELL and CASTLES,. concur.

## ON HEARING

PER CURIAM.

In the above entitled cause an opinion was filed on Decem--

ber 7, 1971, and appears in 496 P.2d 1143. On petition for rehearing by the West Great Falls Flood Control and Drainage District, rehearing was granted by an Order dated February 8, 1972. The rehearing was granted in all matters, but the Court desired elaboration upon the affect upon current outstanding indebtedness of the District caused by any decision made.

Rehearing was had on May 5, 1972. The Court has reconsidered all matters and affirms its opinion heretofore promulgated.

As to the financial affairs of the District, during oral argument the District sought what it termed "guidance" from this Court. The district court is the proper jurisdiction to make these determinations, and we decline to discuss those matters herein.

Accordingly, the opinion heretofore promulgated is adopted and the remittitur shall issue forthwith.